

JMG/USAO # 2014R00763

ENTERED ___ LODGED ___ RECEIVED

DEC -1 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 14-0555 |
| v. | (Soliciting and Receiving Illegal Remuneration in |
| VIC WADHWA, | Violation of the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b)(1)(B); |
| *Defendant.* | Aiding and Abetting, 18 U.S.C. § 2) |

## INFORMATION

The United States Attorney for the District of Maryland charges that:

### COUNT ONE

**(Soliciting and Receiving Illegal Remuneration
in Violation of the Anti-Kickback Act)**

At all times material to this Information:

#### Introductory Allegations

1. Defendant **VIC WADHWA** was a resident of Jersey City, New Jersey. From in or about late 2009 or early 2010 through in or about September 2012, defendant **WADHWA** was employed by, and served as the Chief Financial Officer (CFO) of, a practice group of pain management clinics located in central Maryland (hereafter referred to as "the Pain Management Practice Group"). **WADHWA** commuted down to Maryland to work at the Pain Management Practice Group on a weekly and sometimes bi-weekly basis. As the CFO of the Pain Management Practice Group, **WADHWA** was responsible for, among other things, overseeing and finalizing

the practice's accounting functions, purchasing equipment, and handling personnel-related functions, including staff discipline.

2. The Pain Management Practice Group was co-owned by Doctor # 1 and Doctor # 2, although it employed a number of other physicians as well. Mr. M.K. served as the Chief Executive Officer (CEO) of the Pain Management Practice Group from approximately February 2009 until on or about August 31, 2012. In carrying out his responsibilities as CFO, defendant **WADHWA** reported to, and received instructions and directions from, Doctor # 1 and Doctor # 2 and from Mr. M.K.

3. The Medicare Program (Medicare) was (and is) a federal health care program enacted by Congress on July 30, 1965, under Title XVIII of the Social Security Act. Medicare provides for basic insurance coverage for inpatient and outpatient medical services for individuals age 65 and over, as well as for certain persons entitled to Social Security benefits because of disabilities. Medicare was (and is) a "federal health care program" as defined by Title 42, United States Code, Section 1320-7b(f), and a "health care benefit program" as defined by Title 18, Section 24(b).

4. The Center for Medicare and Medicaid Services (CMS) was (and is) the federal agency responsible for the administration of the Medicare program. Individuals who received benefits under the Medicare program were and are referred to as "beneficiaries."

5. The Federal Employees Health Benefit Program (FEHBP) was (and is) a federally funded medical health benefit program that provides health insurance benefits to federal employees, retirees from federal service, and their family members. The Office of Personnel Management (OPM) is an agency of the United States that administers the FEHBP. The FEHBP likewise was a "Federal health care program" as

2

defined by Title 42, United States Code, Section 1320-7b(f), and a "health care benefit program" as defined by Title 18, Section 24(b).

6. As part of their pain management practice, the Pain Management Practice Group's physicians often prescribed various controlled substances to their patients. It is important for pain management physicians to monitor their patients' use of pain relief medications carefully for indications that the patients are abusing their prescriptions, or are not using their medications but are instead reselling them in order to purchase narcotics. Pain management physicians therefore sometimes require patients who have been prescribed controlled substances to submit urine samples for testing in order to monitor the levels of pain medication or other narcotics in their bodies. The Pain Management Practice Group generated hundreds of these urine toxicology specimens each month.

7. When pain management patients submit a urine specimen, their physician usually sends these specimens to an outside testing laboratory, which runs a particular panel of tests based upon an order issued by the physician. Depending upon the tests conducted and the insurance coverage, the outside testing laboratory may charge as little as approximately $200 or as much as $2,000 to test a urine specimen. Testing laboratories typically bill patients' private insurers or Medicare or the FEHBP for the cost of performing these tests, which are a covered service under Medicare, the FEHBP, and most private health insurance plans as long as the testing is considered reasonable and necessary. Prior to April 2011, the Pain Management Practice Group's physicians referred their patients' urine specimens to a national testing laboratory whose services were considered satisfactory by the group's physicians.

8. Under the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, it is a violation of federal law to solicit or receive any form of remuneration (including bribes, kickbacks, or rebates) in return for ordering or arranging for any service for which payment may be made in whole or in part under Medicare or any other Federal health care program (including the FEHBP). Federal law accordingly prohibits physicians from submitting urine toxicology specimens to a laboratory for testing in return for remuneration if the lab is paid by Medicare or another federal health care program for testing those specimens. The Anti-Kickback Act was enacted to address concerns that paying kickbacks or providing other forms of remuneration in return for referrals or orders of goods or services may lead to the overutilization of health care services, thereby increasing costs to the government, and may also result in referrals or orders being made based upon the receipt of payments or other forms of remuneration, rather than the quality of the goods or services provided.

## The Kickback Scheme

9. In or about February or March 2011, Mr. M.K. learned that a urine toxicology laboratory in New Jersey (hereafter "the Laboratory Testing Company") was willing to pay a kickback for every urine toxicology specimen that the Pain Management Practice Group submitted to it for testing. After discussions between Mr. M.K., defendant **WADHWA,** and others at the Pain Management Practice Group, it was decided to shift the Pain Management Practice Group's urine toxicology testing work from the national laboratory they had been using to the Laboratory Testing Company in New Jersey.

10. Defendant **WADHWA** was responsible for negotiating the specific terms of the new arrangement with the Laboratory Testing Company's owner. They reached an agreement whereby the Laboratory Testing Company promised to pay kickbacks equal to half of its profit, after accounting for expenses, for every urine toxicology specimen submitted to it for testing by the Pain Management Practice Group.

11. In or about April 2011, the Pain Management Practice Group began submitting orders to the Laboratory Testing Company directing that various tests be performed on urine toxicology specimens submitted by its patients. These referrals continued for approximately sixteen months, ending shortly before defendant Wadhwa and Mr. M.K. last worked for the Pain Management Practice Group in the late summer of 2012.

12. During the period between March 2011 and August 2012, the Laboratory Testing Company received total reimbursement payments of $4,033,846.70 from private insurers, Medicare, and the FEHBP for lab tests ordered by Pain Management Practice Group physicians on urine toxicology specimens submitted by the practice. Of this figure, approximately $3.5 million consisted of payments from private insurers, while $530,191.13 and $7,562.83 respectively (for a combined total of $537,753.96) consisted of reimbursement payments made by Medicare and the FEHBP.

13. Between the time the kickback payments commenced in July 2011 and the end of the scheme in July 2012, the kickbacks paid by the Laboratory Testing Company in connection with this arrangement totaled $1,376,540.85. Out of this amount, defendant **WADHWA** received approximately $459,245.92, while more than $400,000 was paid to Mr. M.K., and the balance was distributed to other persons associated with the Pain Management Practice Group. Approximately one-eighth of

these payments were associated with testing ordered on Medicare or FEHBP beneficiaries. Overall, after accounting for overhead expenses, payments to a broker involved in the transaction, and the payment of the kickbacks discussed above, the Laboratory Testing Company netted a profit of substantially in excess of $1 million between April 2011 and the end of August 2012 on the urine toxicology specimens submitted to it by the Pain Management Practice Group.

### The Charge

14. Beginning in or about the months of February or March 2011 and continuing thereafter until in or about the month of August 2012, the defendant,

**VIC WADHWA,**

together with others known to the United States Attorney, engaged in a scheme whereby he knowingly and willfully solicited and received remuneration (including any kickback, bribe, or rebate), directly and indirectly, overtly and covertly, in cash and in kind, in return for ordering any item or service for which payment may be made in whole or in part under the Medicare program and other Federal health care programs, in that defendant **WADHWA** solicited, demanded, accepted and agreed to accept remuneration from the Laboratory Testing Company in return for the Pain Management Practice Group's agreement to submit urine specimens it obtained from Medicare- and FEHBP-eligible pain management patients to the Laboratory Testing Company for toxicology testing. In furtherance of this scheme, on or about May 30, 2012, at a branch of Bank of America that was located in the State of Maryland, defendant **WADHWA** deposited ten checks totaling $87,619 that were issued between April 4 and May 17, 2012 by the Laboratory Testing Company pursuant to the kickback scheme described

above into a bank account (ending in the numbers 8223) controlled by defendant **WADHWA**.

42 U.S.C. § 1320a-7b(b)(1)(B)
18 U.S.C. § 2

                                                _____
                                                ROD J. ROSENSTEIN
                                                UNITED STATES ATTORNEY FOR
                                                THE DISTRICT OF MARYLAND

Date:   December 1st, 2014