



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Jefferson M. Gray*<br>*Assistant United States Attorney*<br>*Jefferson.M.Gray@usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4915*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091* |

November 4, 2014

DEC 1 5 2014

Larry Allen Nathans, Esq.
Nathans & Biddle LLP
120 East Baltimore Street
Suite 1800
Baltimore, MD 21202

Re:  *United States v. Vic Wadhwa*
Criminal No. MJG- 14 - 0555

Dear Mr. Nathans:

    This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below.  If this offer has not been accepted by Friday, November 14th, it will be deemed withdrawn. The terms of the agreement are as follows.

## Offense of Conviction

    1.    The Defendant agrees to waive indictment and plead guilty to a Criminal Information which will charge him with Soliciting and Receiving Health Care Kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(B).  The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

## Elements of the Offense

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

- First, that the Defendant knowingly and willfully solicited or received remuneration, a cash kickback;

- Second, that the Defendant solicited or received the remuneration (including a cash kickback) in return for ordering any service for which payment may be made in whole or in part by Medicare; and

- Third, that the defendant acted knowingly and willfully.

## **Penalties**

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five (5) years of imprisonment, followed by a three (3) year term of supervised release, and a fine of up to $250,000.00, or (pursuant to 18 U.S.C. § 3571(d)), the greater of twice the Defendant's gross gain or the victims' gross loss).  In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.  (Restitution is not applicable in this case pursuant to 18 U.S.C. §§ 3663 and 3663A(c).)  If a fine is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. [1]  The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked -- even on the last day of the term -- and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.  The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## **Waiver of Rights**

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who

---

[1]      Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      c.    If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

      d.    The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

      e.    If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      g.    If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

      h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his/her attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless

affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998.  The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which the Defendant acknowledges this Office could prove beyond a reasonable doubt if this matter proceeded to trial, and to the following applicable sentencing guidelines factors:

The parties agree that U.S.S.G. § 2B4.1 (Commercial Bribery and Kickbacks) is the appropriate guideline provision in this case.  The base offense level in this case is a level **eight (8)**, pursuant to U.S.S.G. § 2B4.1(a).  As discussed in paragraph nine below, the parties are not in agreement as to whether the amount of the loss is above $400,000 or is below $400,000.  Depending on how that question is resolved, the parties currently expect that the enhancement for the amount of the loss will be either **twelve (12)** levels pursuant to U.S.S.G. § 2B1.1(b)(1)(G), reflecting a loss amount of greater than $200,000 but less than $400,000.00, or **fourteen (14)** levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H), reflecting a loss amount of greater than $400,000 but less than $1 million.  Thus, the parties do agree that the Defendant's offense level prior to any reductions will be at least a level **twenty (20)** and may be as high as a level **twenty-two (22)**.

This Office does not oppose a **two (2)** level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one (1)** level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.  This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e)

obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7.     The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.     This Office and the Defendant agree that except as set forth in paragraph nine below, there are no other facts or sentencing guideline calculations that are in dispute, and, accordingly, with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Guideline Factors Remaining in Dispute

9.     The parties currently are not in agreement with regard to the exact amount of the loss, which they agree will be determined by calculating the total amount of the improper benefit conferred upon the Laboratory Testing Company as a result of the unlawful kickbacks (which consists of the payments from Medicare and the Federal Employees Health Benefit Plan, minus the legitimate expenses incurred by it in running the tests), so long as this amount is greater than the pro rata share of the kickbacks paid that were attributable to reimbursement payments for testing related to Medicare and FEHBP beneficiaries. (Based on the information presently available to it, the government believes that this figure is unlikely to exceed $450,000.00, and the defense believes it may be under the $400,000 threshold.) It is the expectation of both parties that it will be possible to define this number with greater specificity by the time of sentencing in this case.

## Obligations of the United States Attorney's Office

10.     At the time of sentencing, this Office will recommend that the Defendant be sentenced at a point within the lower half of the applicable sentencing guideline range.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

## Forfeiture

12.     The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture.  Specifically, as a consequence of the Defendant's plea of guilty to the Information charging a violation of 42 U.S.C. § 1320a-7b(b)(1), the Court will order the forfeiture of all proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).  The property to be forfeited includes, but is not limited to, funds included in the bank accounts and assets listed in Attachment B.  The government agrees it will satisfy the order of forfeiture, so far as possible, by means of the various assets identified in Attachment B to the plea agreement.

13.     The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

## Assisting the Government with Regard to the Forfeiture

14.     The Defendant agrees to assist fully in the forfeiture of the assets identified in Attachment B.  The Defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture.  The Defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied.  In this regard, the Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

## Waiver of Further Review of Forfeiture

15.     The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.  The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any

property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## **Waiver of Appeal**

16.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.     The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 37 months' imprisonment; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below 24 months' imprisonment.

c.     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## **Obstruction or Other Violations of Law**

17.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will

7

be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

18.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

8

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Jefferson M. Gray
Assistant United States Attorney

    I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/13/14                           _____
Date                                Vic Wadhwa

    I am Mr. Wadhwa's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

11/13/14                           _____
Date                                Larry Allen Nathans, Esq.

9

## ATTACHMENT A

The parties hereby stipulate and agree that if this matter had proceeded to trial, the Government could have presented testimonial and documentary evidence sufficient to establish the following facts.

From in or about December 2009 until late August 2012, defendant Vic Wadhwa was employed as the Chief Financial Officer of a group of pain management clinics located in central Maryland (hereafter referred to as "the Pain Management Practice Group"). During this period, the Pain Management Practice Group was co-owned by Doctor # 1 and Doctor # 2, although other physicians also worked for the practice as employees. Wadhwa was originally approached about working for the Pain Management Practice Group by an old friend, Mr. M.K., who served as the Pain Management Practice Group's Chief Executive Officer (CEO). Wadhwa, who lived in northern New Jersey, commuted down to Maryland to work at the Pain Management Practice Group on a weekly and sometimes a bi-weekly basis. As the Pain Management Practice Group's CFO, Wadhwa was responsible for, among other things, overseeing and finalizing the practice's accounting functions, purchasing equipment, and handling personnel-related functions, including staff discipline. He received instructions and directions from Doctor # 1 and Doctor # 2 and from Mr. M.K.

As part of their pain management practice, the Pain Management Practice Group's physicians often prescribed various controlled substances to their patients, who would sometimes remain on these medications for extended periods. It is important for pain management physicians to monitor their patients' use of pain relief medications carefully for indications that the patients are abusing their prescriptions, or are not using their medications but are instead reselling them in order to purchase narcotics.

1

Pain management physicians therefore periodically require patients who have been prescribed controlled substances to submit urine samples for testing in order to monitor the levels of pain medication or other narcotics in their bodies. The Pain Management Practice Group's clinics generated hundreds of these urine toxicology specimens each month. Testing on such specimens is usually conducted by outside testing laboratories which, depending upon the tests conducted and the insurance coverage, may charge amounts ranging from approximately $200 to as much as $2,000 to test a urine sample. These testing laboratories typically bill patients' private insurers or federal health insurance programs such as Medicare or Medicaid for the cost of performing the tests. Prior to April 2011, the Pain Management Practice Group's physicians submitted their patients' urine specimens to a national testing laboratory whose services were considered satisfactory by the group's physicians.

Under the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, it is a violation of federal law to solicit or receive any form of remuneration (including bribes or kickbacks) in return for ordering, arranging for, or recommending the ordering of any service for which payment may be made in whole or in part under any federal health care program, including Medicare and the Federal Employees Health Benefit Program (FEHBP). Federal law accordingly prohibits physicians from submitting urine specimens to a laboratory for testing in return for the payment of kickbacks if the lab receives reimbursement from any federal health insurance program for testing those specimens. The Anti-Kickback Act was enacted to address concerns that the payment of kickbacks in return for patient referrals or the ordering of health care-related goods or services may lead to overutilization of services; may increase costs to the government and private insurers; and may result in decisions about patient referrals or the ordering of goods,

2

services, or medical equipment being made based upon the payment of kickbacks, rather than the quality of the service or items provided.

In or about February or March 2011, Mr. M.K. informed defendant Wadhwa that a urine toxicology laboratory in northern New Jersey (hereafter "the Laboratory Testing Company") was willing to pay a kickback for every urine toxicology specimen that the Pain Management Practice Group submitted to it for testing. Following discussions between Mr. M.K., defendant Wadhwa, and others at the Pain Management Practice Group, it was decided in March 2011 to shift the Pain Management Practice Group's testing business from the national testing laboratory it had been using to the Laboratory Testing Company in New Jersey. Defendant Wadhwa conducted the negotiations about this arrangement with the Laboratory Testing Company's owner. They reached an agreement whereby the Laboratory Testing Company promised to pay kickbacks equal to half of its profit, after accounting for expenses, for every urine toxicology sample submitted to it for testing by the Pain Management Practice Group.

The Pain Management Practice Group began submitting urine toxicology samples to the Laboratory Testing Company in March 2011. The arrangement continued for approximately sixteen months, ending shortly before defendant Wadhwa and Mr. M.K. last worked for the Pain Management Practice Group in the late summer of 2012.

During the period between March 2011 and August 2012, the Laboratory Testing Company received total reimbursement payments of \$4,033,846.70 from private insurers, Medicare, and the FEHBP for lab tests ordered by Pain Management Practice Group physicians on urine toxicology specimens submitted by the practice. Of this total reimbursement figure, approximately \$3.5 million consisted of payments from private insurers, while \$530,191.13 and \$7,562.83 respectively (for a combined total of

3

$537,753.96) consisted of reimbursement payments made by Medicare and the FEHBP. The Laboratory Testing Company incurred costs of $690,602.69 in running the tests on all of the specimens submitted to it by the Pain Management Practice Group's physicians. The parties are still in the process of calculating the value of the improper benefit conferred upon the Laboratory Testing Company as a result of the violations of the Anti-Kickback Act.

Between the time the kickback payments commenced in July 2011 and the end of the scheme in July 2012, the kickbacks paid by the Laboratory Testing Company in connection with this arrangement totaled $1,376,540.85. Out of this amount, defendant Wadhwa received approximately $459,245.92 as a result of the scheme, while more than $400,000 was paid to Mr. M.K., and the balance was distributed to other persons associated with the Pain Management Practice Group. Because the payments received from Medicare and FEHBP payments constitute approximately 13% of the total reimbursement payments, the pro rata share of the kickbacks that were paid by the Laboratory Testing Company and that were attributable to the federal reimbursement payments (as opposed to those from private insurers) is approximately $178,950.30. Overall, after accounting for overhead expenses, payments to a broker involved in the transaction, and the payment of the kickbacks discussed above, the Laboratory Testing Company netted a profit of substantially in excess of $1 million between April 2011 and the end of August 2012 on the urine toxicology specimens submitted to it by the Pain Management Practice Group.

In furtherance of this scheme, on or about May 30, 2012, at a branch of Bank of America that was located in the State of Maryland, defendant Wadhwa deposited ten checks totaling $87,619 that were issued between April 4 and May 17, 2012 by the

4

Laboratory Testing Company pursuant to the kickback scheme described above into a bank account (ending in the numbers 8223) held in the name of a consulting company that he controlled.

## ATTACHMENT B

The following accounts are subject to the forfeiture provisions in paragraphs 11-14 of this agreement. Accounts marked as "frozen" are currently frozen by Court order in connection with the pending civil litigation in *Advanced Pain Management Services, LLC, et al. v. Wadhwa, et al.*, Case No. 1:12-cv-03579-MJG (D. Md.).

### Personal Bank Accounts

| | | |
|---|---|---|
| Bank of America (BoA) account # 3839 (checking) | $47,339.88 | (Frozen) |
| BoA account # 9730 (savings) | $   265.51 | (Frozen) |
| PNC Account # 0231    (checking) | $ 2,390.26 | (Frozen) |
| Citizens Bank Account # 9535  (checking) | $ 3,037.41 | (Frozen) |
| **Subtotal:** | $53,033.06 | (Frozen) |

### Business Bank Accounts

| | | |
|---|---|---|
| BoA (Munich Mgmt) account # 8223 (checking) | $21,804.00 | (Frozen) |
| BoA (Munich Mgmt) account #4105 (savings) | $30,462.42 | (Frozen) |
| BoA (Wadhwa LLC) account # 4105 (checking) | $4,742.69 | |
| BoA Star Healthcare Purchasing # 2359 (checking) | $1,370.64 | |
| **Subtotal:** | $58,379.75 | |

### Other Assets

| | |
|---|---|
| BoA:  Silver bars in safe deposit box | $4,800 |

### Investments

| | |
|---|---|
| Start-Up Investment in Mobiplex | $50,000 |

### Wells Fargo Bank Accounts

| | |
|---|---|
| Wells Fargo account # 8773 (checking) | $4,899.87 |
| Wells Fargo account # 8786 (checking) | $15,316.24 |
| **Subtotal:** | $20,216.11 |

## <u>Efficient Management & Consulting Accounts</u>

| | |
|---|---|
| **BoA account # 2595 (checking)** | $1,548.25 |
| **BoA account # 6398 (checking)** | $150,435.56 |
| **Subtotal:** | $151,983.81 |